*1331 OPINION.
Trammell:
The only issue for consideration at this time is whether the petitioner is entitled to personal service classification for the years 1919, 1920, and 1921. The petitioner contends that during these years its income was to be ascribed primarily to the activities of the principal owners or stockholders who were regularly engaged in the active conduct of its affairs and that capital, whether invested or borrowed, was not a material income-producing factor.
For the years here involved the petitioner employed nonstock-holders as contact men or account executives, artists, copywriters, bookkeepers, stenographers, clerks, errand boys, et cetera, as set out in our findings of fact, and at the salaries here indicated.
During 1919 the petitioner employed an average of five nonstock-holders as contact men at salaries ranging from $125 to $325 per month and whose total compensation for the year amounted to $17,213.48. During 1920 and 1921, the average number of this class of employees was four. In 1920 their salaries ranged from $200 to $450 per month, and for 1921 their total compensation amounted to $12,920. In 1919 the number of nonstockholding contact men or account executives alone exceeded the number of active stockholders. They assisted in preparing copy- for advertisements, circulars, and follow-up letters required by the clients. They called on clients, furnished the means of contact between the petitioner and its clients, and were responsible for the production of business. These were not mere ministerial employees, such as stenographers and bookkeepers. The duties performed by this class of employees were unquestionably a material part of the service rendered by the petitioner.
While the evidence indicates that the work performed by the artists was only incidental to the chief service rendered by the petitioner, it also indicates that the work performed by the copy writers was of considerable importance.
In 1919 the average number of employees, including copy writers and contact men, was 20, for 1920 and 1921 the average was 35 and 34, respectively. • These employees were as necessary to the operation of the business as the services of the stockholders. Aside from the amount of discount received in 1918 on account of the prompt payment of bills, the facts for that year which would warrant the personal service classification were no stronger than for the years in *1332 volved in this proceeding. For 1918 Ave held that the petitioner Avas not entitled to personal service classification. 1 B. T. A. 1010.
From a consideration of the facts in these proceedings, Ave can not find that the services of nonstockholding employees, taken as a Avhole, Avere not a material income-producing factor, during at least the year 1919, and that the petitioner’s income for that year is to be ascribed primarily to the principal stockholders. See Cuyahoga Abstract & Title co. v. Commissioner, 29 Fed. (2d) 448.
The petitioner contends that for 1920 and 1921, the owners of 70 per cent and 71 per cent, respectively, of its stock and who Avere regularly engaged in the active conduct of the affairs of the corporation were the principal stockholders and as such fulfilled the statutory requirements. For 1920 the number of inactive stockholders Avas reduced from 3 to 2 by S. T. Balcom selling her- one share of stock to H. K. Turnbull. While Harris held 10 shares in 1919, he had only 1 share in 1920, when Fannie S. Turnbull’s holdings increased from 90 to 199 shares. In 1920, of the 10 stockholders, Fannie S. Turn-bull held the second largest amount of stock, having 30.24 per cent, and Harris held the smallest, amount, or about 16 per cent. In 1921 Fannie S. Turnbull was the only inactive stockholder to hold stock throughout the year. Harris held one share until February 2, 1921, Avhen he ceased to be a stockholder.
We have heretofore considered whether the principal stockholders of a corporation Avere regularly engaged in the conduct of a corporation’s business when large percentages of stock were held by inactive stockholders. In Harvey Friction Spring Co., 11 B. T. A. 309, Avhere 31.1 per cent of the stock was held by those who gave no attention to the business, Ave held that the principal stockholders were not regularly engaged in the conduct of the petitioner’s business. In Holland Engraving Co., B. T. A. 762, we refused to allow personal service classification where approximately 33 per cent of the stock was held by inactive stockholders. On this question, the United States District Court in the case of Fuller & Smith v. Routnahn, 23 Fed. (2d) 959, said:
The laAv was directed at absentee stock ownership. If the service rendered is in the nature of personal service and is rendered by the owners of the business, the law intended a separate classification for income and excess profits taxes. It Avas intended to give corporations performing services of this nature and in this manner the same tax position as a partnership. The dominating purpose was to distinguish betAveen corporations engaged in trade, merchandising, and manufacturing, in which much capital is required, and without Avhich profits may not be earned, and corporations performing personal services, in which large capital is not usually required or necessary to its efficient conduct. The discrimination is between income earned by capital and *1333 income earned by personal effort. The specific limitations in section 200 were inserted in aid of this dominant purpose and to prevent evasion. They should not be stressed to the point of destroying the major purpose of the law. Sections 200 and 218, Revenue Act of 1918 (Comp. St. §§ 0330 l/8a, 6330 l/8i), fax personal service at the same rate and in the samo manner as partnerships. The number of partners and the amount of their respective interests is not made a test. So, under this section, the amount of the interest of the several stoek-bolders is not to be taken as a controlling test. The controlling test must bo looked for in another direction. It is whether the activities of the corporation are carried on by its owners regularly engaged, not whether some of its owners have a greater or less amount of stock. The law intended to forbid absentee stockholding interests of a material size.
We think in this case that the inactive stockholders for 1920 and 1921 held sufficient stock, to wit, 30.3 per cent in 1920 and 28.5 per cent in 1921, to be classified as principal stockholders. The requirement of the statute that the principal stockholders must be regularly and actively engaged in the business was, in view of this fact, not met.
In the latter part of 1920 the petitioner found it necessary to depart from the usual method of collecting from advertisers before making payment of publishers’ bills. Certain of its clients from whom it received a large part of its business were unable on account of the then existing agricultural depression to pay for the advertising which had been ordered. From these the petitioner accepted notes in payment of bills. In 1920 the petitioner accepted notes amounting to $210,000 from the Ottawa Manufacturing Co., whose gross business for the year amounted to $435,600.49. Some of this client’s notes taken during 1920 remained unpaid at the beginning of 1924. From another client, Rahe Auto & Tractor School, whose gross business in 1920 amounted to $112,291.15, the petitioner took notes amounting to $56,135.37. The petitioner also carried the A. J. Kirstin Co. on an open account to the extent of $25,241.50 on a gross business of $41,857.40. About the same time that the petitioner was taking notes from the above-mentioned clients, it also took notes in an undisclosed amount from another client from which it obtained about one-third of its business during 1919, 1920, and until the middle of 1921.
During 1920 the petitioner’s income from discounts amounted to $9,966.37, or 3.7 per cent of the total income. Income from interest amounted to $2,827.57, or 1.7 per cent of total income. The income for 1920 from these two sources therefore constituted 5.4 per cent of the total income. In 1921 petitioner’s income from discount was $9,926.74, and from interest was $6,853.53, which amounts constituted 5.7 per cent and 3.9 per cent respectively, or a total of 9.6 per cent of the total income.
*1334 With respect to the borrowings by the petitioner after the beginning of the agricultural depression in the latter part of 1920, H. K. Turnbull testified as follows:
Q. Did you borrow any substantial sums any time during tbis period?
A. We bad to during that period to remain alive.
Q. Can you give any details about that, when and bow much?
A. I do not recall the date or the amount but I know it was necessary for us to continue to discount our bills with the publishers or lose our agency recognition or standing as it is.
$ í¡t ⅜ * ⅜ * ⅜
Q. Do you know the amount of money that you borrowed during 1920?
A. No, sir.
Q. Can you give any general idea of the amount?
A. I do not recall.
Q. The statement of liabilities and assets shows $25,000 bills payable at the end of 1921. Would you say that amount was large or small as compared with the condition throughout that year?
A. I do not remember.
He further testified:
Q. Now, will you state the nature of the item of bills payable, bank, $25,000 for December 31, 1921?
A. We had to borrow some money to pay these publishers, and keep ourselves going during that period when the money was not coming in from these advertisers.
Q. Supppose you had not borrowed that money, what would have happened?
a. We would have been out of business.
Q. You would have lost your agency recognition?
A. Yes, sir.
* * *⅜ * ⅛ * *
A. I might add a little more in answer to that last question. It is possible that we could have gone along in some way for we had a good name, and ridden over that difficulty in some different way which m.'ght have been in accord with the income tax regulations as they seem now to want to apply them, but, we did what seemed to us a business like thing, and followed the a business like procedure at the time, and did the best that we knew how without in any way changing the character or type of our business.
From the above, it is clear that the petitioner was financing substantial portions of the advertising of certain of its largest clients. In paying publishers or otherwise arranging with them for payment of the advertisers’ bills or accepting notes from the advertisers, the petitioner was extending credit to the advertisers.
While income from discount and interest does not constitute a very great part of the total income, yet the returns from the use of capital are not to be looked for in these items of income alone. During 1920 and 1921 the petitioner was borrowing money for use in the business. Some of it was being used to pay publishers for the advertising done for the petitioner’s clients. The petitioner contends that the payments were made to the publishers in order to maintain its recognition or standing as an advertising agency. It is not so important why *1335 the petitioner used borrowed money in its business, but it is important, in view of the provisions of the statute, that it did use substantial amounts of borrowed money in carrying on its business. The record does not show that the petitioner’s income for 1920 and 1921 would not have been just as large if it had not extended credit to its clients. But on the other hand, there is much to indicate the contrary. In fact, the testimony of the petitioner’s president shows that the company’s existence actually depended upon the use of capital, either paid in or borrowed.
In view of all the facts, we are of the opinion that capital was a material income-producing factor in 1920 and 1921. For neither of the years involved has the petitioner met the requirements of the statute in order to come within the personal service classification.
Reviewed by the Board.

Further proceedings will be had under Rule 62 (d) in Dochet No. 11756. Judgment will be entered for the respondent in Dochet No. 13025.

Sieekin did not participate.
MoRRis and Van Fossan concur in the result.